UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SOLEL UMANI,
a.k.a. Anthony Bethea,

        CASE NO. 07-CV-10649

    Plaintiff,

        DISTRICT JUDGE ANNA DIGGS TAYLOR

v.        MAGISTRATE JUDGE CHARLES E. BINDER

HUGH WOLFENBERGER,[1] Warden;
JOE SCOTT, ADW;
KEITH GREEN, FSD;
and CONNIE IGNASIAK, AFSD;

    Defendants.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 64)

**I.    RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that the motion be **DENIED.**

**II.    REPORT**

    **A.    Introduction**

Plaintiff Solel Umani is a state prisoner who is currently incarcerated at the Michigan Reformatory in Ionia, Michigan. The events that form the basis of the instant complaint occurred while Plaintiff was incarcerated at the Macomb Correctional Facility ("MRF") in New Haven, Michigan. On February 13, 2007, Plaintiff filed this *pro se* civil rights action under 42 U.S.C. §

---

[1] The correct spelling of defendant's name is Wolfenbarger, which will be used in the remainder of this Report.

1983 and an application to proceed without prepayment of fees pursuant to the *in forma pauperis* ("IFP") statute. (Docs. 1 & 2). IFP status was granted on February 15, 2007. (Doc. 3.) An order dismissing the Michigan Department of Corrections ("MDOC") was entered on March 8, 2007. (Doc. 4.) Pursuant to an order adopting the first Report and Recommendation filed in this matter, Defendants Patricia Caruso, Charlene Carberry, and Robert Al Shareef were dismissed. (Doc. 39.) Pro bono counsel was assigned to represent Plaintiff on December 5, 2008 (Doc. 52) and the remaining Defendants filed the instant motion for summary judgment on April 23, 2009. (Doc. 64). Plaintiff responded (Doc. 65) and Defendants replied. (Doc. 66.) Upon review of the documents, I conclude that, pursuant to E.D. Mich. LR 7.1(e)(2), this motion is ready for Report and Recommendation without oral argument.

### B. Factual Allegations and Record Evidence

Plaintiff alleges that on February 7, 2005, he was "employed as an assistant lead at MRF food service and obtained permission from [his] supervisor and Defendant, FSS [Food Service Supervisor][2] Robert Al Shareef to leave early." (Compl., Doc. 1 ¶ 13.) Later that day, Defendant FSD [Food Service Director] Green informed Plaintiff that he was "[b]eing laid-in with loss of bonus for leaving work without permission." (*Id.* ¶ 14.) Plaintiff "vehemently denied the allegation, told Defendant Green [that he] had been authorized by staff, tried to reason with him [but] to no avail." (*Id.* ¶ 15.) The following day, FSS Al Shareef issued a minor misconduct ticket to Plaintiff, "alleging that [Plaintiff] left work without permission." (*Id.* ¶ 16.) As a result, Plaintiff was "laid in . . . pending the outcome of the alleged misconduct." (*Id.* ¶ 17.)

Deposition testimony clarified the relationship between prison jobs and misconduct. Minor misconduct tickets, such as the one originally given Plaintiff for leaving the work assignment

---

[2]Defendants' job titles are derived from paragraphs 4-10 of the complaint.

2

without authorization, are given directly to the assigned housing unit staff member, an informal hearing is held, and a decision is made within two weeks so the staff person can be replaced if needed. (Ignasiak Dep., Doc. 65, Ex. 1 at 30-34.[3]) The ticket was based on the fact that Plaintiff should have "checked out" with the supervisor rather than simply leaving, despite the permission he was granted to leave at that time from the same supervisor (Al Shareef). (*Id.* at 93.)

Defendant Green stated in his deposition that on February 7, 2005, he noticed a prisoner working two "slots." He learned that Plaintiff was missing, asked supervisor Shareef where Plaintiff was, and Shareef indicated that Plaintiff was in the back and that he would go and get him. However, Plaintiff had left the area by that time, so Defendant Green called the housing unit and eventually met Plaintiff in the food service office. (Green Dep., Doc. 64, Ex. 2 at 4-6.) When Defendant Green asked Plaintiff why he left the assignment, Plaintiff indicated he had permission from Shareef. (*Id.* at 6.) Defendant Green then told Plaintiff, "I just talked to Shareef, Shareef said he didn't give him permission to leave" and "if he didn't give you permission to leave, you are getting a ticket for being off assignment." (*Id.*) According to Defendant Green's own testimony, Shareef only told him that Plaintiff was in the back; however, Shareef did ultimately issue the misconduct ticket for leaving work without permission.

On February 11, 2005, a hearing was held by "ARUS Wade [who] spoke with FSS Al Shareef on the phone, confirmed through him that he did in fact give [Plaintiff] permission to leave work early . . . [and therefore] found me not guilty . . . and ordered me to return to work." (Doc. 1 ¶ 20.) On February 12, 2005, Plaintiff returned to work. (*Id.* ¶ 21.) As Plaintiff notes, policy provides that if found not guilty of misconduct, the inmates are to return to work. (Doc. 65 at 8.)

---

[3]The page numbers given refer to the deposition transcript's original page numbers, not those assigned by the Court's electronic filing system, since all readers may not have access to the documents in electronic form.

3

Plaintiff alleges that ARUS Wade informed Plaintiff that he had been "scolded" for finding Plaintiff not guilty and that Plaintiff "would probably be terminated." (Doc. 1 ¶¶ 22-23.) On February 19, 2005, while working, Plaintiff "observed Warden Wolfenberger, ADW [Assistant Deputy Warden] Scott, FSD Green, and AFSD [Assistant Food Service Director] Ignasiak in the office talking for some time." (*Id.* ¶ 25.) Defendant Al Shareef "summoned [Plaintiff] to the office" and on his way there Plaintiff was told by Defendant Green that he would be terminated. (*Id.* ¶ 26.) When Plaintiff asked why he would be terminated, Plaintiff alleges that Defendant Green told him to ask Defendant Ignasiak, but when Plaintiff pressed Defendant Green further, he responded, "That little shit Wade did [*sic*] ain't working with nothing. Ya'll some worthless convicts. Some niggers are insignificant in the scheme of things around here." (*Id.* ¶ 27.)

Plaintiff avers that Defendant Ignasiak told Plaintiff he was terminated because he left without permission. (*Id.* ¶ 29.) When Plaintiff responded that ARUS Wade found him not guilty, Plaintiff alleges that Defendant Ignasiak stated, "'[a]nd we know about ARUS Wade. And we know how you people stick together. Don't worry. The Deps' got his number and so does the warden.'" (*Id.* ¶ 30.) Plaintiff further alleges that Defendant Ignasiak told him that "she and Defendant Green had 'discussed the matter with the warden and had determined that [Plaintiff] was in fact guilty, irrespective of ARUS Wade's findings.'" (*Id.* ¶ 31.)

Deposition testimony and affidavits support the allegation that Defendants discussed the matter and determined that Plaintiff should be terminated despite ARUS Wade's findings. Defendant Green's and Defendant Ignasiak's affidavits state that although Plaintiff did have permission to leave early, he did not notify anyone at the time he left, thereby causing a stoppage, so Defendants Green and Ignasiak "would have recommended termination regardless of the 'not guilty' finding because Plaintiff's actions of not notifying someone that he was leaving violated

4

the integrity of the work assignment." (Green Aff., Doc. 21 ¶ 5; Ignasiak Aff., Doc. 22 ¶ 5.) Defendant Green indicated that he spoke with Defendant Ignasiak and that they "figured we need to – we probably need to terminate this prisoner based on him actually leaving the assignment regardless of the ticket." (Green Dep., Doc. 64, Ex. 2 at 30.) Green stated that "[i]t is not personal. It is strictly business. You go off assignment, we can't control that environment, it becomes a security risk." (*Id*. at 35.) Defendant Green further noted that, "[r]egardless how good [Plaintiff's] record was, he had a minor misconduct ticket that affected the operation, and it also affected the security of our operation, so we felt he needed to be terminated." (Green Dep., Doc. 65, Ex. 2 at 39.)

Plaintiff also alleges that the work report he received from Defendant Ignasiak had been altered by Defendants Ignasiak and Green to lower his evaluation rating from an above average score of 37 to a far below average score of 1. (Doc. 1 ¶ 32; Ex. E.) Defendants confirm that this "reevaluation" occurred. Defendants state that on February 8, 2005, Plaintiff was evaluated and received a score of 37 but was re-evaluated on February 18, 2005, and received a 31. (Def.'s Mot., Doc. 19 at 3, Ex. 4.)[4] Deposition testimony confirms that Plaintiff was "reevaluated" per the Defendants' conversation as a means to terminate Plaintiff's employment. Defendant Wolfenbarger indicated that after Plaintiff was found not guilty of the misconduct, the other Defendants asked him what the alternatives would be because "they wanted to fire [Plaintiff] on the basis of the misconduct report. [Wolfenbarger] suggested they use the classification document, what [they] call 363, basically a work report, and give [Plaintiff] a bad work report and turn it in

---

[4] I note that Exhibit E to the complaint is not a completed form, while Exhibit 4 attached to Defendants' brief is. In addition, Plaintiff's exhibit has no individual ratings circled as answers to questions 1-13 and yet reflects a "total score" of "1." Since there can be no "total" score rendered from unscored individual questions and since the individual scores and total score of "31" or "32" on Defendants' exhibit is a more reasonable number, I suggest that Defendants' exhibit is the actual evaluation and that Plaintiff's exhibit is not accurate and therefore should be discounted.

5

to the classification director." (Wolfenbarger Dep., Doc. 64, Ex. 4 at 3-5.) Defendant Scott confirmed that the conversation occurred and that he told the other Defendants, Green and Ignasiak, that they could either "write a ticket on a prisoner violating the rules"or "write a program work report and address the behavior and send it to the classification director and request termination." (Scott Dep., Doc. 64, Ex. 3 at 5.)[5]

The only area where Defendants' deposition testimony contradicts Plaintiff's averments relates to whether any racially derogatory comments were made or whether any decisions were based on race. When defense counsel inquired of Defendant Ignasiak whether any of her actions had anything to do with race, she responded, "no" and further explained that the prisoner-worker population "per policy [] needs to reflect the same as the population of the prison [a]nd normally we are within 2 or 3 percent and normally it is somewhere over 60 percent nonwhite, 40 percent white." (Ignasiak Dep., Doc. 64, Ex. 1 at 81.) Defendant Green confirmed the policy when he stated that, "in maintaining the prisoner employment in food service, we try to balance the amount of black prisoners opposed to white prisoners. So we have a 50 percent or either a 60/40 ratio of prisoners. I also try to make sure that when we hire prisoners in promotion slots, there's the same type of percentage." (Green Dep., Doc. 64, Ex. 2 at 47.) Defendant Green further stated that he is a "[b]lack male." (*Id*. at 48.) Defendant Green denies making any comment using the word "nigger" because it "[e]ven offends me using that word against my race of people." (*Id*. at 49.)[6]

Plaintiff's remaining claims are: (1) conspiracy against Defendants Ignasiak, Green, Scott

---

[5]If the classification director agreed, then termination would follow. (Ignasiak Dep., Doc. 65, Ex. 1 at 33.)

[6]Although not argued or raised on these facts, I note that even if "benign," such race-based quotas are constitutionally suspect. *See Shaw v. Hunt*, 517 U.S. 899, 904-05, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996); *United States v. Ovalle*, 136 F.3d 1092, 1105 (6th Cir. 1998).

6

and Wolfenbarger, and (2) equal protection against Defendants Ignasiak, Green, Scott, and Wolfenbarger.

### C.  Defendants' Motion for Summary Judgment

#### 1.  Summary Judgment Standard

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (holding that appeals court should not have viewed the facts in the light most favorable to the non-moving party when that party's version of events was so utterly discredited by video tape evidence).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**2.     Qualified Immunity Defense**

Defendants move for summary judgment on the grounds that they are entitled to qualified immunity on both remaining claims. (Doc. 64 at 6-8.) The Supreme Court has explained that, pursuant to the defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

8

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The rationale underlying the doctrine is that "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* Qualified immunity further recognizes that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation he confronts. 'If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense.'" *Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

The defense of qualified immunity "can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (citing *Kennedy v. City of Cleveland*, 797 F.2d 297, 299-300 (6th Cir. 1986)). When raised after discovery, "the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).

Thus, when a defendant moves for summary judgment on the basis of qualified immunity, the analysis involves three inquiries: (1) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (2) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "whether the plaintiff has offered sufficient evidence to

9

indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

In deciding qualified immunity questions, courts were for some years required to address these inquiries in sequential order. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005); and *Klein v. Long*, 275 F.3d 544 (6th Cir. 2001) (both citing *Saucier*, 533 U.S. at 201). However, the sequential approach is no longer mandated; trial judges are now permitted to use their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, ___U.S.___, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

### 3. Whether a Constitutional Violation Occurred

#### a. Equal Protection Claim

To establish a claim under the Equal Protection Clause,[7] a plaintiff must demonstrate that the government treated the plaintiff differently than similarly situated persons and that such treatment either burdened a fundamental right, targeted a suspect class, or had no rational basis. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006). "When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called 'class of one' theory and must prove that the government's actions lacked any rational basis." *Id.* I will address the two possible theories applicable to the instant case: suspect class based on race and class of one.

---

[7]The Equal Protection Clause is the final portion of the first section of the Fourteen Amendment, which provides as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

10

### i.    Suspect Class Based on Race

Defendants argue that "Plaintiff must show that Defendants treated him differently because of his race or that they conspired to treat him differently because of his race" but that Plaintiff has "proven neither." (Doc. 64 at 7.) Defendants further contend that "race had nothing to do" with their actions and that even "after having an opportunity to engage in discovery, Plaintiff failed to come forward with sufficient evidence to support his equal protection or conspiracy claims." (Doc. 64 at 7.) Defendants also assert, but proffer no evidence in support, that "[i]t is more likely than not that he was replaced with another black worker [because] [k]eeping a racial balance was an important goal in food service." (*Id.*)

In order to prevail on an equal protection claim based upon the application of a facially neutral statute or policy, a plaintiff must establish that the challenged practice "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002) (citing *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985)). "Discriminatory purpose . . . implies more than . . . awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (citations omitted). Discriminatory effect is established by showing that similarly situated individuals of a different race were not prosecuted or were otherwise treated differently. *Id. See also Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004) ("In order to make out an equal protection claim on the basis of selective enforcement, a plaintiff must demonstrate that someone similarly situated but for the illegitimate classification used by the government actor was treated differently.").

In this instance, Plaintiff alleges that he was treated differently from others to whom the policy of returning an inmate to work once found not guilty of alleged misconduct was applied. Plaintiff alleges that Defendant Green used a racial epithet and made comments to the effect that ARUS Wade's finding of not guilty would be ignored because Wade was an "insignificant" member of his race, while Defendant Ignasiak's statements implied that ARUS Wade's finding would be overlooked because he was known for taking the side of inmates who were members of his race. (Compl., Doc. 1 ¶¶ 27, 30.)[8]

A pattern of harassment involving racial slurs or the use of racial slurs along with some other conduct that deprives the victim of established rights may violate equal protection. *Knop v. Johnson*, 977 F.2d 996, 1013-14 (6th Cir. 1992); *Merritt v. Hawk,* 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001) (inmate's allegations that numerous racial epithets were aimed at him during an alleged assault were sufficient to survive summary judgment). However, evidence of use of a racial epithet alone is insufficient proof of an equal protection violation to survive summary judgment. *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation"); *Burton v. Livingston*, 791 F.2d 97, 101 n.1 (8th Cir. 1986) ("A simple allegation that an individual prison guard used racially offensive language in dealing with a prisoner might not, by itself, state a claim under the Equal Protection Clause"); *Searcy v. Gardner*, No. 3:07-0361, 2008 WL 400424, at *4 (M.D. Tenn. Feb. 11, 2008)

---

[8]Although Plaintiff's reiteration of statements made by Defendants are hearsay, it is possible that the statements would be admissible as a statement against interest if the declarant is unavailable under FED. R. EVID. 804(b)(3), or under the residual hearsay exception FED. R. EVID. 807, or more likely as impeachment evidence against any declarant who testifies to the contrary. I note that impeachment evidence can be adequate to survive summary judgment. *Sowemimo v. Cowan*, No. 01-255-DRH, 2004 WL 3495227, at *2 (S.D. Ill. Feb. 17, 2004). *Accord Muhammed v. City of Chicago*, 316 F.3d 680, 683-84 (7th Cir. 2002) ("to have prevented summary judgment, [Plaintiff] needed to provide specific evidence when attacking [witness's] credibility, such as contradictory eyewitness accounts or other impeachment evidence").

("plaintiff's allegation that defendant [] used a racial epithet in his presence likewise fails" to state an equal protection claim).

Here, the alleged racial epithet and comment that ARUS Wade's findings were the product of his favoring members of his own race were made while describing their concerted action in "reevaluating" Plaintiff to justify removing Plaintiff from his employment despite his having been found not guilty of any misconduct. I suggest that since the alleged racial commentary was made in reference to conduct of which the Plaintiff complains, this case is more closely analogous to the cases involving the use of racial epithets along with other conduct. I therefore suggest that, when viewing the facts in evidence in the light most favorable to Plaintiff, he has offered sufficient evidence to indicate that his constitutional rights were violated by objectively unreasonable conduct on the part of Defendants.

    **ii.    Alternative Analysis - Class of One**

Under a "class-of-one" equal protection theory, Plaintiff must show that he was intentionally treated differently from other similarly situated persons and that there was no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000); *Ross v. Duggan*, 402 F.3d 575, 588 (6th Cir. 2004). The "class-of-one" theory is not appropriate when the decision is "discretionary," i.e.,"based on a vast array of subjective, individualized assessments," because "treating like individuals differently is an accepted consequence of the discretion granted" and "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Engquist v. Oregon Dep't of Agriculture*, ___ U.S. ___, 128 S. Ct. 2146, 2153-54, 170 L. Ed. 2d 975 (2008). "This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized,

resting on a wide array of factors that are difficult to articulate and quantify." *Id*. "Thus, the class-of-one theory of equal protection . . . is simply a poor fit in the public employment context." *Id*. at 2154-55.

In the case at bar, however, Plaintiff's termination was not made on a host of subjective factors, but rather was based on the sole reason that Plaintiff's leaving his work station, albeit with permission, was a security risk. (Green Dep., Doc. 21 at 1-2.) Therefore, I suggest that the "class of one" theory may be applied in this case.

The Sixth Circuit explained in *Club Italia* how a plaintiff can demonstrate that a government action lacked a rational basis:

> Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purpose that the court can only conclude that the government's actions were irrational. A Plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will. . . . The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law.

*Club Italia*, 470 F.3d at 298 (citations omitted). In the instant case, Plaintiff has alleged and Defendants' deposition testimony shows that instead of following the prison's policy of allowing an inmate found not guilty to return to work and remain there unless and until another issue arises, Defendants "reevaluated" Plaintiff for the purpose of terminating his recently regained employment because they disagreed with ARUS's exculpatory findings. Defendants' stated rationale for deviating from policy rests on the sole assertion that Plaintiff's failure to notify the same supervisor who had given him permission to leave work that he indeed was leaving work at the agreed-upon time "violated the integrity of the work assignment" and "could have created a critical incident, such as riot." (Ignasiak Dep., Doc. 22 ¶ 4; Green Dep., Doc. 21 ¶ 4.) I suggest

14

that Defendants have provided Plaintiff with sufficient evidence to overcome any presumption that their actions were rational and to further show that their actions were motivated by ill-will or animus, racial or not. *See Franks v. Rubitschun*, 312 Fed. App'x 764, 766 (6th Cir. 2009) (reversing and remanding for consideration of class-of-one equal protection claim where plaintiff alleged state parole board did not follow its own policies in its treatment of plaintiff "on the basis of personal animus, rather than on any rational basis.")

Therefore, I suggest that even if the Court were to find that Plaintiff has not provided sufficient evidence of racial animus under the suspect class (race) theory, Plaintiff could survive summary judgment under a "class of one" theory.

    **b.**    **Conspiracy Claim**

In order to state a cause of action for conspiracy to violate constitutional rights under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws; and (3) an act in furtherance of that conspiracy (4) which causes injury to person or property, or a deprivation of a right or privilege of a United States citizen. *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996). A plaintiff must also show some racial or other class-based invidiously discriminatory animus behind the conspirators' actions. *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998). Vague and conclusory allegations of conspiracy unsupported by material facts are insufficient to state a claim. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

For summary judgment purposes, "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances [that the alleged co-conspirators] had a meeting of the minds and thus

reached an understanding to achieve the conspiracy's objectives." *Robinson v. Township of Waterford*, 883 F.2d 75, 79 (6th Cir. 1989) (internal citations omitted).

I suggest that Plaintiff has, under the standards set forth above, stated and sufficiently supported a claim for conspiracy to survive summary judgment. Defendants have, in their deposition testimony, confirmed that they had a meeting of the minds because "they wanted to fire [Plaintiff]" so they recreated an employment review (form 363) and requested termination. (Wolfenbarger Dep., Doc. 64, Ex. 4 at 3, 5; Doc. 65, Ex. 5 at 5; Scott Dep., Doc. 64, Ex. 3 at 4-5; Doc. 65, Ex. 6 at 5.) I therefore suggest that, when viewing the facts in evidence in the light most favorable to Plaintiff, he has offered sufficient evidence to indicate that his constitutional rights were violated by objectively unreasonable conduct on the part of Defendants.

### 4.     **Whether the Law was Clearly Established**

Defendants argue that even if evidence of equal protection and conspiracy violations are sufficient to survive summary judgment, the law was not so clearly established such that Defendants' actions were objectively unreasonable. (Doc. 64 at 8.) I suggest, however, that the law was clear at the time these events transpired that government officials violate equal protection rights when they intentionally treat a person differently from others similarly situated based upon racial animus or ill-will, because when that occurs, there is no rational basis for the difference. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000); *Herron v. Harrison*, 203 F.3d 410 (6th Cir. 2000). Furthermore, I suggest that the law was also clearly established that government officials may not conspire together to violate civil rights. *See Griffin v. Breckenridge*, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971). I therefore suggest

that Defendants are not entitled to qualified immunity and that their motion for summary judgment should be denied.

III. **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

          s/ *Charles E. Binder*
          CHARLES E. BINDER
Dated: June 16, 2009          United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and electronically served on counsel of record via the Court's ECF System.

Date: June 16, 2009    By    s/Patricia T. Morris
                          Law Clerk to Magistrate Judge Binder